## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

IN RE: GREGORY HAMPTON, JR.                    Case No. 4:14-bk-14632 J
                                                                (Chapter 7)

                  Debtor.


THE BANK OF FAYETTE COUNTY                              PLAINTIFF


VS.                          AP No. 4:14-ap-01123


GREGORY HAMPTON, JR.                                    DEFENDANT

### MEMORANDUM OPINION

Before the Court is the *Complaint Objecting to Dischargeability of Debt* (the

"**Complaint**") filed by The Bank of Fayette County (the "**Bank**") on December 12, 2014, and

the *Answer* to the Complaint filed by the Defendant Gregory Hampton, Jr. (the "**Debtor**") on

March 9, 2015. A trial on the merits was held on August 27, 2015, in Little Rock, Arkansas.

The Bank appeared by and through its attorneys Harris Shelton Hanover Walsh, PLLC, by

Steven N. Douglass, Esq. and Pablo A. Varela, Esq. Cathy Mathis also appeared as the Bank's

representative. The Debtor appeared in person and by and through his attorney, Danyelle J.

Walker, Esq. At the conclusion of the trial, the Court took the matter under advisement. For the

reasons stated herein, the relief sought in the Complaint is denied. The debt owed by the Debtor

to the Bank is determined to be dischargeable.

## JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).  The following constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

This dispute stems from a loan transaction entered into between the Debtor and the Bank purportedly for the purchase of a vehicle.  In November 2012, the Debtor visited his relative, Barron Marshall ("**Mr. Marshall**"), who owned Southwind Auto Sales in Memphis, Tennessee ("**Southwind**").  The Debtor, twenty-seven years old at the time and a resident of North Little Rock, Arkansas, desired to purchase a new car.  He met with Mr. Marshall on more than one occasion, but never found a vehicle he wanted to purchase at Mr. Marshall's dealership.  During one of his trips to Memphis, Mr. Marshall persuaded the Debtor to go with him to the Bank to see if the Debtor could qualify for a low interest rate.  The Debtor understood from Mr. Marshall that he would qualify for a lower interest rate if he used a Memphis address.  The Debtor trusted Mr. Marshall who was a relative and who was older and more experienced than the Debtor.  The Debtor believed he was at the Bank to discuss what interest rate he could obtain on the purchase of a BMW 750i if and when Mr. Marshall found one for him to purchase.  At the time, the Debtor had not found a vehicle he wanted to purchase.

The meeting at the Bank was actually a loan closing whereby the Bank loaned the Debtor $31,921.35 for the purchase of a 2011 BMW 535i, which served as collateral for repayment of the loan (the "**Collateral**").  The Collateral listed on the loan documents was a 5 Series BMW,

not a 7 Series BMW like the Debtor wanted.  The purchase price was reduced by a trade-in allowance on the vehicle the Debtor had been driving, which was his mother's vehicle.

The loan proceeds were paid to Southwind.  The Bank, however, never received title to the Collateral and believes the Collateral to be "missing."  (Compl. ¶¶ 9-10).  The Debtor never received the Collateral from Southwind, nor did the Debtor ever receive any other vehicle from Southwind, except for a "loaner" Mr. Marshall allowed the Debtor to drive for a period of time after convincing the Debtor to leave his mother's vehicle at the dealership so as to not increase the mileage on the vehicle.

Almost two years later, on August 28, 2014, the Debtor filed a voluntary petition for relief under the provisions of Chapter 7 of the United States Bankruptcy Code.  Shortly thereafter, on December 12, 2014, the Bank filed its Complaint seeking to have its claim against the Debtor determined to be nondischargeable.

In the Complaint, the Bank argued that pursuant to 11 U.S.C. § 523(a)(2)(A) the Bank's claim should be determined nondischargeable because the debt owed to the Bank by the Debtor resulted from the Debtor "obtaining money or a renewal of credit . . . by false pretenses, false representation and actual fraud" and such misrepresentation caused the Bank to suffer a loss in the amount of the debt remaining due and owing to the Bank on the note. [1]  (Compl. ¶¶ 14-16). The Complaint does not allege the specific representation alleged to be false or the actions alleged to be fraudulent.

---

[1] This argument was made in Count I of the Complaint.  The Complaint also asserted a second count.  In Count II of the Complaint, the Bank argued its claim should be determined nondischargeable pursuant to 11 U.S.C. § 523(a)(6) because the Debtor willfully engaged in a fraudulent scheme with Southwind to allow Southwind to purchase the Collateral for later resale at a profit to the Debtor and Southwind, which resulted in conversion of the Collateral. During closing arguments, however, the Bank acknowledged that no evidence was presented on Count II during the trial.  Accordingly, the relief sought in Count II is denied.

At the trial, the Bank argued false representation, false pretenses, and actual fraud by the Debtor in that the Debtor represented, or someone made a representation with the Debtor's approval and knowledge, that he lived on Haversham Way in Memphis, Tennessee, when in fact the Debtor lived in North Little Rock, Arkansas. The Bank alleged this representation was false and was deliberately made for the purpose of deceiving the Bank "in order to obtain a benefit." (Tr. at 202). The benefit was a loan, at a lower interest rate. The Bank argued that while the Debtor disavowed the misrepresentation because it was Mr. Marshall who provided the false information to the Bank and not the Debtor himself, Mr. Marshall provided the information to the Bank with the Debtor's permission, knowledge, and agreement, making the misrepresentation attributable to the Debtor. Finally, the Bank argued that it justifiably relied on the false representation in making the loan and had suffered a loss due to making the loan.

The Debtor argued that he was relying on his elder relative, Mr. Marshall, who owned the car dealership and was experienced in buying and selling cars. The Debtor argued that he trusted this family member in directing him to use the Memphis address to get a lower interest rate at a bank where Mr. Marshall had a business relationship. In retrospect, the Debtor stated at trial that he had come to understand that he should not have trusted Mr. Marshall. The Debtor argued he simply wanted to purchase a new car; he was not intentionally trying to deceive the Bank. The Debtor also argued that the Haversham Way address was sent to the Bank by Mr. Marshall and was not information that the Debtor provided to Mr. Marshall nor did the Debtor, himself, provide any false information to the Bank. The Debtor also argued that the Bank approved the loan because he owned a home, had a good credit score, good income, good employment history, and had good payment histories on all his debts reported on his credit report, not because of the Haversham Way address provided to the Bank by Mr. Marshall.

4

**FACTS**

At the trial, the Bank introduced documentary evidence and presented the testimony of Cathy Mathis, a representative of the Bank.  The defense presented the testimony of the Debtor.  The testimony of each of the two witnesses and the documentary evidence is summarized below.

***The Bank's General Background Information***

At the time of the trial, Ms. Mathis was the branch manager/vice president of two of the Bank's nine branches.  She had been employed with the Bank for eight years, but had been in the banking business for over twenty-five years.  She had been in the lending area for about twenty years and had made numerous car loans.

In 2012, at the time of the loan transaction involved in the case, Ms. Mathis had authority to make loans in an amount up to $75,000.00 without any additional approval.  At the time of the trial, Ms. Mathis had no loan authority.  On cross-examination she admitted she had been demoted and her demotion resulted from circumstances surrounding the loan transaction with the Debtor.

Ms. Mathis testified concerning the Bank's lending area stating that it was "West Tennessee, some of Tennessee, the Memphis Metropolitan area. . . . West Memphis, North Mississippi, Fayette County, [and] Hardeman County."  (Tr. at 19).  An exhibit was introduced that was identified as being from the Bank's loan manual.  (Pl.'s Ex. 1).  The exhibit described the "Primary Lending Area" as "twenty-four census tracts comprised of Fayette County (with 11 census tracts), that are part of the Memphis Tennessee-Mississippi-Arkansas Metropolitan Statistical Area . . . and McNairy County (with 7 census tracts) and Hardeman County (with 6 census tracts) located in the southwest corner of the State of Tennessee."  (Pl.'s Ex. 1).  The

5

exhibit suggested that in some circumstances loans may be made outside the primary lending areas.[2]

***The Bank's Automobile Loan Process in General***

Ms. Mathis testified that she was familiar with the Bank's policies and procedures on automobile loans. She testified that the process starts with a dealer sending the Bank information it has on a customer, usually in the form of a "buyer's order." Ms. Mathis testified that the Bank uses the buyer's order to obtain the VIN,[3] the borrower's name, trade-in information, information on the vehicle to be purchased, and the amount being requested for financing.

The Bank also pulls a credit report when it receives the buyer's order. When Ms. Mathis would review a credit report she would typically look at all information on the report including the credit score, the address, the employment information, outstanding debts, the payment histories for these accounts, and other information provided. Ms. Mathis testified that when the loan involves a trade-in vehicle, she typically verifies whether there is a lien on a car when she pulls a credit report.

The Bank also compares address information from the buyer's order with the credit report or driver's license. If the addresses are different, the Bank will request proof of the borrower's address. Proof of address is not required unless the driver's license shows an address

---

[2] The exhibit provided:

> It is the policy of the Bank to make loans secured by real estate or interests in real estate in the Bank's primary lending area. As the Bank continues to open retail offices in additional markets, our trade area is expanding, and our loan officers are encouraged to solicit loans in all of these local markets. Real estate loans significantly outside of these areas require approval of President, Senior Creditor Officer or Loan Committee.

(Pl.'s Ex. 1).

[3] Vehicle Identification Number

different from that shown on the credit report or other information the purchaser gives the Bank. The Bank also requires proof of insurance.

Ms. Mathis testified that she takes the information from the buyer's order to produce a memorandum that she uses in-house. This in-house memorandum is then sent to her processor who, in turn, processes the loan documents for her, including the credit application, promissory note, security agreement, and an insurance document. Ms. Mathis also testified that before a loan is closed, if the Bank has either approved or pre-approved a loan, the Bank looks for proof of income. All of these items are checked because the Bank must be certain the purchaser can repay the loan.

Ms. Mathis also discussed the normal procedures used at the loan closing. She described her normal procedure as going over "each and every document" with the borrower to explain the terms including interest rate, payment, first payment date, and purpose of the documents being signed. (Tr. at 20). The customer is also given an opportunity to ask questions about the documents.

### The Debtor's Loan Transaction with the Bank

Ms. Mathis and the Debtor both testified about the transaction between the Bank and the Debtor. Both agree that the Debtor was not a Bank customer prior to this loan transaction. Much of the rest of the relevant testimony is in dispute. Ms. Mathis discussed how the Debtor's loan transaction was processed by the Bank and discussed the loan documents involved. The Debtor testified concerning his motivation to buy an automobile at a Tennessee dealership, the documents relied upon by the Bank, and his limited involvement in the loan process. Both parties testified regarding the manner in which the loan closing was handled. A summary of the testimony follows.

The Debtor began his testimony stating that his name includes, "Jr.;" he lives at 912 West 51st Street, in North Little Rock, Arkansas; he has lived there for about four years; and he owns the home.  He has a mortgage on the home and signed a promissory note and mortgage when he purchased the home.  When he signed the loan documents to purchase his home, the closing was handled by one of his "mom's friends" who "went through everything" at the home loan closing. (Tr. at 162).  He also testified that while he had never purchased a vehicle before, he had financed a motorcycle with Suzuki and signed a note and security agreement to purchase the motorcycle.  He stated that he usually has his mother and father with him whenever he signs papers like the ones on the home mortgage and motorcycle loan.

The Debtor was twenty-seven years old at the time of the loan transaction.  He is a high school graduate with one year of college.  He was raised by his mother and father, who were in the courtroom with him at the trial.  In November 2012, he was working at the United States Postal Service ("**USPS**") in North Little Rock, Arkansas.  He had worked for the USPS for about five or six years at the time.

_Southwind._  In November 2012, the Debtor was driving a 2006 BMW 750i, which he referred to as a 7 Series BMW.  This 2006 BMW 750i was his mother's vehicle, but he was making the note payments on her loan.  When he decided he wanted to purchase a vehicle around November 2012, he contacted Mr. Marshall.  Mr. Marshall is the Debtor's cousin, but he is older than the Debtor, so the Debtor has always referred to him as "Uncle Barron."  (Tr. at 129).  Mr. Marshall owned a car dealership, Southwind, and because of this the Debtor thought Mr. Marshall could get him a good deal on a new car.  The Debtor contacted Mr. Marshall and told him he was interested in purchasing a new Corvette.  The Debtor went to Memphis and Mr. Marshall took him to a Corvette dealership, where they learned that the new Corvettes would not

be available for some time. The Debtor then decided he would purchase a newer model BMW 750i and went back to Mr. Marshall's car dealership looking for a vehicle. He did not find a vehicle he liked.

At Mr. Marshall's instruction, the Debtor left the car he was driving, his mother's 2006 BMW 750i, at the car dealership and starting driving a vehicle loaned to him by Mr. Marshall to keep from adding mileage to the 2006 BMW 750i. The Debtor testified that he did not see, test drive, or pick out a 2011 BMW 5 Series at Mr. Marshall's car dealership. When asked if he saw the 2011 BMW 5 Series associated with the loan documents on the car lot, he testified that he could assume one of the vehicles he saw on the lot was the Collateral, but it was not the car he wanted and none of the cars he saw on the lot was the actual vehicle described in the promissory note as the collateral for the loan. He further testified that he never obtained the Collateral nor any other 2011 BMW 5 Series.

The Debtor testified that he made more than one trip to Memphis to check on Mr. Marshall's progress in finding him a vehicle. During one of these visits, the Debtor testified that he was directed by Mr. Marshall to go with him to visit one of Mr. Marshall's friends at the Bank to see if they could obtain a lower interest rate for a car loan. At the time, the Debtor had not found a car he wanted to purchase on Mr. Marshall's car lot and had his mind set to purchase a newer BMW 750i. The Debtor described the visit to the Bank as a meeting with Ms. Mathis, Mr. Marshall, and himself. From the testimony before the Court it appears that the Debtor understood that they were going to meet with Mr. Marshall's friend at the Bank to see about what interest rate was possible for the Debtor, not go to a loan closing. It is clear from the evidence, however, that the only time the Debtor, Ms. Mathis, and Mr. Marshall met was at the loan closing.

Ms. Mathis and the Debtor testified about the various documents involved in the loan transaction. A summary of the testimony follows.

*The Buyer's Order.* On an unspecified date, but sometime prior to closing, Ms. Mathis testified that the Bank received a buyer's order (the "**Buyer's Order**") from Southwind, which Ms. Mathis explained was a dealership she had done business with in the past. Ms. Mathis stated that the loan process between the Debtor and the Bank began when the Bank received the Buyer's Order. Ms. Mathis testified that the information in the Buyer's Order is *provided by the dealer*. The Buyer's Order, which is also called a retail purchase agreement, was dated November 16, 2012, and reflected "Gregory Hampton" as the purchaser. (Pl.'s Ex. 2). It reflected Gregory Hampton's address as "8021 Haversham Way, Memphis, TN 38141, Shelby County" ("**Haversham Way**"). (Pl.'s Ex. 2). The Buyer's Order also reflected a home telephone number, social security number, and date of birth for the Debtor. (Pl.'s Ex. 2). The following information was in the heading of the Buyer's Order: "Southwind Auto Sales, 3518 Riverdale Road, Memphis, TN 38115 *(901) 755-6505*." (Pl.'s Ex. 2) (emphasis added).

The Buyer's Order identified the vehicle being purchased as a black sapphire 2011 BMW 5 Series 535i (which has been defined as the Collateral). (Pl.'s Ex. 2). The trade-in vehicle was listed as the car the Debtor had been driving, his mother's blue 2006 BMW 750i (the "**Trade-in Vehicle**"). (Pl.'s Ex. 2). After a trade-in allowance and partial payment credit, the unpaid balance due was $31,721.35.[4] (Pl.'s Ex. 2). Although places are provided on the Buyer's Order for the signatures of the purchaser and the "Authorized Dealership Representative," no

---

[4] Computed as follows: $43,500.00 cash price, plus $399.00 document fee, less trade-in allowance of $34,200.00, plus balance owed on the trade-in of $25,000.00, plus state tax of $688.15, plus county tax of $80.00, plus business tax of $131.70, plus title/license/registration fees of $122.50, less a $4,000.00 partial payment deposited. (Pl.'s Ex. 2).

signatures were on the exhibit introduced at trial.  (Pl.'s Ex. 2).  Ms. Mathis testified that most

buyer's orders from automobile dealers are not signed.

On cross-examination, Ms. Mathis admitted that the Buyer's Order could have been sent

by the dealer without the Debtor's knowledge, but believed the likelihood was slim given that the

Buyer's Order contained the Debtor's social security number.  The Debtor testified that he does

not recall ever seeing the Buyer's Order.  He testified that he did, however, give Mr. Marshall a

copy of his driver's license, pay stub, and his social security number.

*Credit Report*.  Sometime prior to closing, the Bank also obtained a TransUnion credit

report for the Debtor, which credit report was introduced into evidence.  (Pl.'s Ex. 4).  Ms.

Mathis testified that the credit report is the "main part of the equation when [the Bank is] making

loans" because it shows how the customer looks "credit-wise."  (Tr. at 94).  The Debtor's credit

score was 694, which Ms. Mathis testified was a good credit score.

Consistent with her testimony regarding the general loan process, Ms. Mathis testified

that she reviewed the Debtor's credit report for a number of things.  She reviewed it to see if

there was a lien on the Trade-in Vehicle.  The credit report reflected an installment account with

"Amer Honda," which Ms. Mathis assumed was a lien on the Trade-in Vehicle.  Ms. Mathis

stated she drew a line through the number "695," which represented the monthly payment on the

American Honda loan, because she was not including that monthly payment in the debt-to-

income ratio as she believed the Debtor was trading in that vehicle.  Ms. Mathis first testified

that she obtained this information from the Buyer's Order, but on cross examination, Ms. Mathis

agreed with Debtor's counsel that the credit report merely reflected a lien on *a* vehicle and did

not reflect what type of vehicle was security for the American Honda loan.  She also admitted

that she did not have any conversation with the Debtor about the debt owed to American Honda.

She could not tell from the credit report whether the loan was co-signed, but she considered the loan to be in the Debtor's name since it was on his credit report.  She also stated that the payment history for the automobile loan on the credit report indicated that "he had paid perfectly."  (Tr. at 39).

The Debtor's testimony concerning the American Honda loan contradicted the testimony given by Ms. Mathis.  He testified that the American Honda loan was for a vehicle his mother purchased.  He stated that his father, Gregory Hampton, Sr., was the co-signer on the loan with his mother.  The Debtor testified that he was not on the note with his mother, but this was not the first time something would show up on his credit report because he and his father have the same name, Gregory Hampton.

Ms. Mathis also reviewed the credit report for the Debtor's address.  The credit report reflected the Debtor's North Little Rock address as the Debtor's residence.  (Pl.'s Ex. 4).  The fact that the credit report reflected a North Little Rock, Arkansas address instead of the address on Haversham Way in Memphis was of "[n]o concern" to Ms. Mathis, who testified she knew she would have to verify the Tennessee address.  (Tr. at 37).

Ms. Mathis also reviewed the mortgage information reflected on the credit report.  The mortgage was obtained in March 2010 and the payment on the mortgage was $695.00 per month for 360 months.  (Pl.'s Ex. 4).  The credit report again reflected a perfect payment history for the thirty-one months reported.  (Pl.'s Ex. 4).

The credit report also reflected payment histories for several other debts and all showed perfect payment histories for the time reported.  In addition, the credit report contained employment information for the Debtor showing his employer as the USPS with the employment being verified April 16, 2009, and August 20, 2010.  (Pl.'s Ex. 4).  When asked whether she

12

talked to the Debtor about his credit report, Ms. Mathis simply stated that she complimented him on how good it was.

*Earnings Statement.*  Sometime prior to closing, the Bank also obtained a copy of a USPS earnings statement for the Debtor for the pay period September 22, 2012 through October 5, 2012 (the "**Earnings Statement**").  (Pl.'s Ex. 10).  The Earnings Statement reflected total gross pay of $2,991.65.  (Pl.'s Ex. 10).  The Debtor's address did not appear on the Earnings Statement.  (Pl.'s Ex. 10).  There were two headers on the Earnings Statement.  The first header reflected, "11/18/2012  18:43  Office Depot  Page 02/03."  (Pl.'s Ex. 10).  The second header, which was above the first header reflected, "11/20/2012  09:32  *9017556505*  Main  Page 04/05." (Pl.'s Ex. 10) (emphasis added).  This fax number is the same number as a number listed for Southwind on the Buyer's Order.  (Pl.'s Exs. 2, 10).  Ms. Mathis stated that the headers indicate that she had the Earnings Statement before closing the loan, but she did not know who provided the Earnings Statement to the Bank.  She also testified that she would not have made the loan if she had not received the Earnings Statement before closing.

The Debtor recognized the Earnings Statement but did not recognize the fax number in the second header at the top of the Earnings Statement.  He denied knowing that the Bank had his Earnings Statement and did not know how the Bank obtained the Earnings Statement, but testified that he gave the Earnings Statement to his relative, Mr. Marshall.

*Consumer Loan Memorandum.*  Consistent with Ms. Mathis's testimony concerning the general loan process, the Bank introduced a consumer loan memorandum (the "**Internal Loan Memo**") prepared by the Bank in connection with the Debtor's loan transaction.  (Pl.'s Ex. 5). Ms. Mathis testified that the Internal Loan Memo was prepared from information obtained from the Buyer's Order, credit report, and Earnings Statement.  Ms. Mathis referred to the Internal

Loan Memo as "my memo" throughout the hearing.  The Internal Loan Memo reflected the Haversham Way address obtained from the Buyer's Order.

Other information contained on the Internal Loan Memo was the credit score of 694, presumably obtained from the credit report, and gross monthly income of $5,983.00, which Ms. Mathis stated came from the Debtor's Earnings Statement.  Monthly expenses on the Internal Loan Memo included $625.00 in rent or mortgage expenses,[5] $695.00 in bank loan expenses, and payment for "this loan" of $633.39, resulting in a debt-to-income ratio of 35.09%.  (Pl.'s Ex. 5).  The Internal Loan Memo reflected a loan amount of $31,921.35, with a sixty-month term and an interest rate of 6.99%.  (Pl.'s Ex. 5).  The collateral was listed as a 2011 BMW 535i (which has been defined as the Collateral) with a value of $41,200.00, resulting in a loan-to-value ratio of 77%.  (Pl.'s Ex. 5).

Ms. Mathis explained that once the Bank completed the Internal Loan Memo, the memo went to her loan processor who processes the loan documents.

*Credit Application*.  The documents prepared by the loan processor included a credit application.  Ms. Mathis's testimony about the credit application was unclear.  When asked how the Bank created the Debtor's credit application, Ms. Mathis first responded "with information from . . . the dealer . . . and then the customer has to sign it."  (Tr. at 28).  When asked on cross-examination if the information on the credit application was "pretty much generated from the buyer's order," Ms. Mathis responded, "Yes."  (Tr. at 89).  She then corrected her testimony to add that the information would come from the Buyer's Order "and [her] memo."  (Tr. at 90).  She also indicated that some of the information is pulled from the credit report.  Ms. Mathis did

---

[5] The credit report reflected two payments of $695.00 per month.  One was associated with the American Honda loan Ms. Mathis testified she did not include on the Internal Loan Memo, the other was the $695.00 payment to Bank of America on the home mortgage loan.  It is unclear from where the $625.00 "rent or mortgage" expense originated.

14

not communicate with the Debtor about the information on the credit application created by the Bank.

The credit application was dated November 26, 2012, the date of the closing, and indicated the amount of loan requested was $31,921.35 for the purchase of a motor vehicle. (Pl.'s Ex. 3).  The credit application listed the applicant's name as Gregory Hampton, Jr., and the address listed was the Haversham Way address.  The credit application reflected that the Debtor owned the Haversham Way address; however, the block related to that question indicating "how long" he had owned the property reflected "0.00."  (Pl.'s Ex. 3).  Although the Debtor's rent/mortgage monthly expense was shown on the Internal Loan Memo, the rent/mortgage payment information on the credit application was blank.  (Pl.'s Ex. 3).  Ms. Mathis, on cross-examination, admitted that the information on the credit application *including the address* was not provided or generated by the Debtor.  She also admitted that she did not know whether the Haversham Way address was an apartment or a house.

 The portions of the credit application related to the applicant's current and previous employer, salary, other sources of income, alimony, child support, nearest relative, outstanding debts, and assets were all blank.  (Pl.'s Ex. 3).  Although no income was listed, the block asking whether the income listed was likely to be reduced before the credit request was paid off was checked "No."  (Pl.'s Ex. 3).  The credit application also stated that the Debtor had not previously received credit from the Bank.  (Pl.'s Ex. 3).

No bank accounts were listed on the credit application.  (Pl.'s Ex. 3).  On cross-examination Ms. Mathis was questioned about whether the Debtor had any checking accounts at the time of the loan and she responded as follows: "He doesn't – he did not bank with me, no." (Tr. at 92).  When asked about whether the Debtor had any savings accounts at the time, she

15

responded "[n]ot with The Bank of Fayette County." (Tr. at 93). The Debtor testified that at the time of closing he did in fact have both a checking account and a savings account elsewhere, but was not asked about whether he had either type of account by the Bank.

Similarly, no real estate assets were listed on the credit application. At the time of the closing the Debtor owned his North Little Rock, Arkansas home. When asked why the Debtor's home and mortgage information was not reflected on the credit application Ms. Mathis stated as follows: "It's just a very, you know, I mean, we're not going through all of this because this is all listed on his credit report. . . . So that's why we're so detailed on the credit report." (Tr. at 93).

The credit application listed the Collateral as the property to be given as security. (Pl.'s Ex. 3). The Debtor's initials and signature appeared on the credit application and Ms. Mathis testified that she witnessed the Debtor sign and initial the application. (Pl.'s Ex. 3).

*Promissory Note.* The loan processor also prepared the promissory note (the "**Note**"). (Pl.'s Ex. 11). The Note was dated November 26, 2012, and was in the principal amount of $31,921.35. (Pl.'s Ex. 11). The borrower was listed as Gregory Hampton, Jr., and the Haversham Way address was listed. (Pl.'s Ex. 11). The Note was to be repaid in sixty monthly installments, the first fifty-nine being in the amount of $631.89 beginning December 26, 2012, and a single, final payment of the unpaid balance of principal and interest being due on November 26, 2017. (Pl.'s Ex. 11). The Note was signed by the Debtor and dated November 26, 2012. (Pl.'s Ex. 11).

*Security Agreement.* The loan processor also prepared the security agreement (the "**Security Agreement**"). The Security Agreement listed the debtor as Gregory Hampton, Jr., and the Haversham Way address was listed. (Pl.'s Ex. 12). The Security Agreement referenced the Note as the debt being secured and described the Collateral as the property securing the loan.

16

(Pl.'s Ex. 12).  Under the descriptions of default, the Security Agreement provided, *inter alia,* that the Debtor would be in default if he failed to make payments when due.  (Pl.'s Ex. 12).  The Debtor's signature was reflected on the Security Agreement below a statement that provided, "By signing, I agree to the terms contained in this Agreement.  I also acknowledge receipt of a copy of this Agreement."  (Pl.'s Ex. 12).

In addition to the loan documents prepared by the loan processor, the Bank introduced copies of other documents associated with the Debtor's loan, which documents are described below.

*Verification of Insurance.*  The Bank introduced a verification of insurance from Progressive Direct (the "**Proof of Insurance**").  (Pl.'s Ex. 8).  The Proof of Insurance identified the driver as Gregory Hampton, Jr., and listed the Haversham Way address.  (Pl.'s Ex. 8).  The Proof of Insurance also identified the Collateral as the covered automobile with the Bank listed as lien holder.  (Pl.'s Ex. 8).  The Proof of Insurance contained the following header, "Fax Server 11/26/2012  2:05:11 PM  Page 3/003  Fax Server."  (Pl.'s Ex. 8).  Ms. Mathis testified that Progressive Direct should have received the information regarding the Collateral from her, and that the Proof of Insurance was most likely forwarded to the Bank by Progressive Direct.  She admitted that the lien holder information for insurance can be provided by the Bank or the dealer, but stated typically the lien holder information is provided by the Bank.  Ms. Mathis testified that she did not know for sure who provided the insurance information to the Bank.

The Debtor testified that he had never carried insurance with Progressive Direct and normally buys insurance from USAA.  He did not obtain the insurance with Progressive Direct reflected on Plaintiff's Exhibit 8.  The first time the Debtor saw the verification of insurance introduced at the trial was when he and his attorney were preparing for the trial.

17

*Proof of Address*.  The Bank also introduced a Memphis Light, Gas and Water bill (the "**Utility Bill**").  (Pl.'s Ex. 9).  Ms. Mathis explained that she had the Utility Bill to show proof of address because the Debtor had an Arkansas driver's license.  She stated further that "in order for us to make the loan, first we have to have proof of address if it's different than the – the credit report or the – the driver's license."  (Tr. at 49).  She stated that she used the Utility Bill as proof of the Debtor's Tennessee residency.  Ms. Mathis stated that she did not recall how or when she received the Utility Bill.  After the Bank's counsel noted that the Utility Bill was dated November 26, 2012, Ms. Mathis stated that she believed she received the Utility Bill on November 26, 2012, the same date as the loan date.  The handwritten notation, "Proof of Address," was placed on the Utility Bill by Ms. Mathis.  Ms. Mathis was clear in testifying that she would not have made the loan if she had not had the Utility Bill for proof of address.

The top of the Utility Bill contained a header which was partially cut off but appeared to reflect the following:  "11/26/20912   10:18   *9017556505*   Main   Page 02/02."  (Pl.'s Ex. 9) (emphasis added).  The fax number is the same number that was reflected on the Buyer's Order as a number for Southwind.  (Pl.'s Exs. 2, 9).  The Utility Bill itself was dated November 9, 2012, and the only place November 26, 2012, appeared on the Utility Bill was in the header at the top of the page.  (Pl.'s Ex. 9).  The Utility Bill indicated it was for Gregory Hampton for services at the Haversham Way address.  The Utility Bill reflected an amount due of $498.48 with a due date of November 29, 2012.  (Pl.'s Ex. 9).  The Utility Bill also contained the following notice:  "A Cut Off Notice was mailed to you on October 31, 2012 with a due date of November 14, 2012.  The past due balance of $427.06 must be received or satisfactory payment arrangements made to avoid automatic disconnection of service.  If you have questions, please

18

contact MLGW." (Pl.'s Ex. 9). There was a reading date on the Utility Bill of October 10, 2012, indicating a bill for the previous month's service. (Pl.'s Ex. 9).

The Debtor's counsel asked Ms. Mathis the following question: "[D]id it not alarm you at all that this is a shut-off notice? It's just proof of – proof of residency?" (Tr. at 105). Ms. Mathis responded that it was just "proof of residence." (Tr. at 105). Ms. Mathis added that the Bank does not drive to the customer's address to see if he or she lives there, stating the following: "I mean, we're talking about, you know, good credit score, good job, good – you know – like I said before – I thought highly of him." (Tr. at 107).

The Debtor did not recognize the Utility Bill and testified he had never seen it before his attorney showed it to him when they were preparing for the trial.

*Driver's License.* Although not introduced into evidence, the testimony revealed that the Bank did receive a copy of the Debtor's driver's license, which reflected an Arkansas address. The Debtor testified that in November 2012 he lived in Arkansas and had an Arkansas driver's license. He also testified that he has never lived at the Haversham Way address.

*The Loan Closing.* Ms. Mathis and the Debtor testified that they had only one meeting, a face-to-face meeting at the time of the loan closing. Mr. Marshall was with the Debtor at the time of the loan closing when the loan documents were signed. The Debtor testified that Ms. Mathis and Mr. Marshall appeared to know one another; they hugged, and started conversing about grandchildren and other personal matters.

The Debtor testified that the reason he was at the Bank was because Mr. Marshall had a "friend" there they could talk to about getting a low interest rate. At the time they went to the Bank (which was the loan closing), the Debtor had not yet found the newer BMW 750i that he wanted to purchase. The Debtor testified that at the time of the loan closing he was not aware

that he was actually borrowing money from the Bank. He did admit, however, that it was his responsibility to understand the paperwork he was signing.

All the loan documents were prepared by the Bank's loan processor and were based on the information contained in the Internal Loan Memo. The physical address information on the Internal Loan Memo was obtained from the Buyer's Order from Southwind, which the Debtor testified he had never seen.

Ms. Mathis testified that she did not remember exactly the words she used at the closing in discussing the Note with the Debtor, but stated that she typically goes "over each individual thing at the top with them." (Tr. at 53). The information at the top of the Note included the loan number, note amount, loan name, account number, interest rate, note date, maturity date, and loan purpose, but it did *not* include the borrower's address. (Pl.'s Ex. 11). She also testified that she typically goes over the payment information with the borrower and the loan purpose paragraph, and in this case the loan purpose was to purchase the Collateral. As to the Security Agreement, Ms. Mathis testified that she generally tells the customer that the document means "if you don't pay, we can take this, because it's going to be ours." (Tr. at 58). Ms. Mathis stated that she explained to the Debtor that the Bank was taking the Collateral as collateral for the Note.

The Debtor's recollection of the closing differed from Ms. Mathis's recollection. The Debtor testified that Ms. Mathis did not go over the documents in detail, nor did she explain the payment amount, interest rate, or other items. When asked if he was "sure she did not go over that information" with him, he replied, "I'm positive. It was – it was quick. It was sign here, sign, signature here." (Tr. at 149).

The Debtor acknowledged that the loan documents reflected the Haversham Way address, but testified that the information on the loan documents was already filled in by the

20

Bank and that he did not notice that address being on the documents at the time he signed them. He further testified that he knew Mr. Marshall had suggested using a Memphis address for a lower interest rate, but he did not realize that was wrong.  He testified, "I didn't think anything would come out of that as far as court or anything.  If I would have known that, I would have not messed with him at all."  (Tr. at 150).  The Debtor was then asked the following question: "When Mr. Marshall suggested that you use this Memphis, Tennessee address, an address that you knew nothing about, did you – did you think that that was wrong?" (Tr. at 192).  He responded, "Not – not really. . . . Because it was just an address.  From what I was thinking, he was saying it would just get a lower interest rate."  (Tr. at 192).  The Debtor testified that he trusted his "uncle's" judgment and that he had never had a reason not to trust Mr. Marshall. When the Debtor was examined by the Court, the following colloquy took place:

> Q      When you signed the paperwork, the paperwork had this 2011 5 Series BMW.  Do I understand your testimony correctly that you never intended to buy that particular vehicle that's on these documents?
>
> A      Yes, ma'am.
>
> Q      So you never intended to buy it?
>
> A      No, ma'am, I wouldn't have bought that.
>
> Q      And when you signed these documents, what did you think you were buying?
>
> A      I didn't think I was buying.  He was working on my interest rate, is what he was he was saying, and I – I see now that I shouldn't have trusted my uncle that much at all.
>
> Q      And when you were asking him about getting your car, if he had gotten the car, did you think these loan documents were going to pay for that car?
>
> A      To be honest, I'm not sure what he was – how it was going to happen.  I just knew whatever I needed to pay to get the car that I wanted, I was willing to pay it because I was working every day.  I guess I just wanted a nice car.

Q       And once your uncle – or Mr. Marshall or Southwind had – let's say they found a car, then would you have started making payments on this loan that we're dealing with today in these exhibits; is that – was that –

A       No.  No. ma'am.  If he found a 750, I was going to start making payments on a 750, and he was saying that it would just lower my interest so my payments would be at a better rate.  And that's what I was willing to do.

Q       If he found a 750, would you sign – did you think the loan you had already made with The Bank of Fayette County was the loan that you were going to use to pay for this car – the 750, the BMW 750?

A       And to be honest, I'm – I'm not sure what would have happened with it.

Q       Okay.

A       I thought, from what Barron was saying – and like I was saying, he's a quick talker, he would say, "I'm going to handle it. Don't worry about that."

(Tr. at 195-96).   Upon redirect the Debtor testified that he actually thought the paperwork in place was "going to roll over, or however [Mr. Marshall] was going to do it, for the 750 or the 7 Series." (Tr. at 197).  However, he did not believe he was getting a loan at the time he signed the loan documents; he did not realize that until the Bank started calling him for payments.

The Debtor was given the opportunity to ask questions at the closing, but Ms. Mathis does not remember him asking any questions.  According to Ms. Mathis, at no time did the Debtor tell her that he was not buying the Collateral or that he did not want the Collateral.

Ms. Mathis testified that she would not have made the loan if she knew the Bank was not getting the Collateral.  She testified the Bank would not have made the loan if she knew the Haversham Way address shown on the loan documents was false.  She also testified that the Bank relied on the Debtor's signature.  When asked what caused the loss to the Bank, Ms. Mathis's response was "[n]ot being truthful on the – you know, the application, the – the note, the security agreement."  (Tr. at 78-79).

Ms. Mathis was asked whether she gave copies of all the loan documents discussed above to the Debtor. She responded that she gave "them" copies of the Note and Security Agreement. (Tr. at 64).

The loan proceeds were payable to Southwind and Ms. Mathis first testified that she would have given Mr. Marshall the check once all the loan documents were signed. (Tr. at 119). Later, she testified that the check was "made out to Southwind Auto, and it was given, you know, they're both right there together – so, I would have handed the check over to the person I make the loan to; in turn, they give the check to whomever." (Tr. at 120). The Debtor's testimony contradicted Ms. Mathis's testimony; he stated that Ms. Mathis passed something to Mr. Marshall, and he was adamant that he did not receive copies of the loan documents.

Ms. Mathis testified that the Bank did not receive the certificate of title for the Collateral, and that she contacted Mr. Marshall about the title, who assured her he would have it sent to the Bank. She further testified that it was the dealership that is supposed to provide the Bank with the certificate of title to the Collateral.

_Haversham Way Address._ Most of the testimony and evidence focused on the use of the Haversham Way address that originated from the Buyer's Order. As stated above, Ms. Mathis used this address to generate the Internal Loan Memo, even though it differed from the credit report and driver's license, because it was the address reflected on the Buyer's Order. From the Internal Loan Memo, Ms. Mathis's loan processor then generated the remaining loan documents that were signed at closing.

It was the Debtor's understanding from Mr. Marshall that a Memphis address should be used in order to obtain a better interest rate. The Debtor acknowledged that using the address was false, but continued to testify it was for a better interest rate not for the loan itself, and that

he did not realize he was actually purchasing a vehicle when he signed the loan documents. He also testified that it was Mr. Marshall that gave the address to the Bank; the Debtor did not give that address to the Bank at any time.

Ms. Mathis testified that the address was not an item that she typically went over with the customer at the loan closing. Contrary to Ms. Mathis's recollection of the loan closing being a process where she went over the terms of the documents specifically with the Debtor, he recalled that the closing was a "real quick" process and Ms. Mathis was just telling him to "sign here, initial here." (Tr. at 144).

### *Events After Closing*

At trial, testimony was given about calls and payments made after the loan closing. In general, at the Bank, once a loan becomes delinquent by twenty days a report is generated for the lender responsible for the loan. Ms. Mathis testified that when she received this report she would try to reach her customers by phone or letter. There were eight payments made on the Note; five of the payments were made late, but not all of the late payments reached the twenty-day delinquent report. She recalled calling the Debtor regarding late payments on his loan. She did not recall when she called the Debtor, but believed she called him two or three times. During at least one of these calls, the Debtor did not respond by saying he did not have a loan with the Bank, nor did he tell her he did not have the Collateral. Ms. Mathis testified that the Debtor did not tell her that he did not have the car until the very last phone call. She said he usually responded that he would "get a payment in." (Tr. at 68).

The Debtor recalled receiving calls from Ms. Mathis and testified that upon receiving the calls he then realized he had borrowed money from the Bank. (Tr. at 151). When he received the call, or message, he would call Mr. Marshall, who always assured the Debtor that

he would "handle it."  (Tr. at 153).  The Debtor testified that he trusted his "uncle" and thought

his "uncle" would handle whatever was happening.  The Debtor further testified as follows:

> I never received a car, I didn't drive a car, so why – why would I have to pay for
> it? I never received a car.  Believe me, I wanted a car.  If I would have had the
> 750, I would have paid for the car, but I never touched that car, so I'm trying to
> figure out how would I have to pay for something I never received or anything?

(Tr. at 175).

When asked if it was his intention to defraud the Bank the Debtor said, "No, ma'am.  I

promise."  (Tr. at 155).  His goal was just to purchase a vehicle.  Even when the Bank was

calling the Debtor about the delinquent payments, he thought Mr. Marshall was still attempting

to find him a vehicle.  He also stated that he did not realize that allowing the Haversham Way

address to be used could be fraudulent.

The Debtor testified that in addition to never receiving the Collateral or any other vehicle

from Mr. Marshall, he never received any of the loan proceeds from Mr. Marshall and never

received any money from Mr. Marshall for being involved in this loan transaction.  At trial,

questions were asked about whether the Trade-in Vehicle was paid off.  The Debtor testified that

he did not believe the Bank paid off the Trade-in Vehicle, but believed it may have been paid off

in some fashion because he received a call from a sheriff.  There was no credible evidence that

the Trade-in Vehicle was in fact paid off or that any of the loan proceeds were used to pay off the

Trade-in Vehicle.

Ms. Mathis testified that the total amount the Bank is seeking for principal, interest,

attorney's fees, and expenses is $39,034.78, plus additional legal fees through the trial date.

## DISCUSSION

This action is brought under 11 U.S.C. § 523(a)(2)(A) of the United States Bankruptcy

Code, which provides that a discharge under Section 727 does not discharge an individual debtor

from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  11 U.S.C. § 523(a)(2)(A) (2012).

Generally, to succeed in having a debt excepted from discharge under Section 523(a)(2)(A) the creditor must prove that "'(1) the debtor made a [false] representation, (2) with knowledge of its falsity, (3) deliberately for the purpose of deceiving the creditor, (4) who justifiably relied on the representation, which (5) proximately caused the creditor damage.'" *Heide v. Juve (In re Juve),* 761 F.3d 847, 851 (8th Cir. 2014) (quoting *Treadwell v. Glenstone Lodge, Inc. (In re Treadwell)*, 637 F.3d 855, 860 (8th Cir. 2011)).

The creditor bears the burden of proving these elements by a preponderance of the evidence.  *See Grogan v. Garner,* 498 U.S. 279, 286–87 (1991).  Exceptions to discharge are "construed liberally in favor of the debtor and strictly against the objecting creditor in order to effectuate the fresh start principles which pervade the entire bankruptcy system."  *Ramsey Nat'l Bank & Trust v. Dammen (In re Dammen),* 167 B.R. 545, 549 (Bankr. D.N.D. 1994) (citing *Gleason v. Thaw,* 236 U.S. 558, 562 (1915); *Caspers v. Van Horne*, 823 F.2d 1285, 1287 (8th Cir. 1987), *overruled on other grounds by Grogan*, 498 U.S. 279).  If an objecting plaintiff fails to prove every element contained within the statutory provision, the indebtedness in question is entirely dischargeable.  *Valley Nat'l Bank v. Bush (In re Bush),* 696 F.2d 640, 643 n.4 (8th Cir. 1983) (citing *In re Mann*, 22 B.R. 306, 307 (Bankr. E.D. Pa. 1982)).

Prior to beginning the analysis of the facts, it seems appropriate to acknowledge the unusual circumstances surrounding this case.  There are three main parties involved in the loan transaction.  First, there is the Debtor, relying on and trusting his relative, Mr. Marshall, to assist

26

him with the purchase of a new car.  Second, there is Mr. Marshall, who not only owns the car dealership involved in the loan transaction but who has had an ongoing business relationship with the Bank.  Third, there is Ms. Mathis, the Bank representative with unfettered loan authority for a loan of this size, who acknowledges having successfully done business with Mr. Marshall and his car dealership in the past.  Mr. Marshall presents the Bank with a loan applicant, the Debtor, who has a great credit score, owns his own home, and has good employment and salary history.  Then, although the Debtor is the loan applicant, it is Mr. Marshall, a person known by both the Bank and the Debtor, who takes the lead in obtaining the loan for the Debtor, providing substantially all the required information to the Bank for the loan approval.  The bizarre results of the loan transaction are that the Debtor is left owing a promissory note secured by a vehicle he never drove, much less received or intended to purchase, the Debtor's Trade-in Vehicle is gone, the Bank is left with a delinquent loan and no collateral to secure the loan, and Mr. Marshall walks away from the Bank with a check made payable to his car dealership in the amount of the loan proceeds.

The Bank now asserts the debt owed by the Debtor should be nondischargeable because it was obtained by false pretenses, false representation, or actual fraud.  To determine whether the Bank's claim should be declared nondischargeable, the Court must examine each of the five elements enumerated above.

### *(1) Did the Debtor make a false representation?*

Although the five elements are generally applied to all three causes of action (false pretenses, false representation, and actual fraud), the analysis of the first element varies depending on the cause of action asserted.  Where the cause of action asserted is false pretenses, the first element is met "'when the circumstances imply a particular set of facts, and one party

knows the facts to be otherwise'" and fails to correct what would otherwise be a false impression.  *Merchs. Nat'l Bank v. Moen (In re Moen),* 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999) (quoting *Trizna & Lepri v. Malcolm (In re Malcolm),* 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992)). The debtor's "silence as to a fact material to his debt obligation to a creditor" can also satisfy the first element for a cause of action under false pretenses.  *Q.C. Fin. Servs., Inc. v. Beza (In re Beza),* 310 B.R. 432, 437 (Bankr. W.D. Mo. 2004) (citing *Check Control, Inc. v. Anderson (In re Anderson),* 181 B.R. 943, 950 (Bankr. D. Minn. 1995)).

When the cause of action asserted is false representation, the first element is met by an express representation that is false at the time made.  *See CNA Fin. Corp. v. Flood (In re Flood),* 498 B.R. 806, 811 (Bankr. S.D. Ohio 2013) (citing *Beverly Enters. v. Eversole (In re Eversole),* 110 B.R. 318, 324 (Bankr. S.D. Ohio 1990)); *Galvin v. Cole (In re Cole),* 164 B.R. 947, 949 (Bankr. N.D. Ohio 1993).  In addition, at least one court has found that the first element under a cause of action for false representation can be met by the Debtor's implied misrepresentation.  *In re Beza,* 310 B.R. at 436.

For a cause of action asserting actual fraud, the first element may be satisfied by proof of "any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another – something said, done or omitted with the design of perpetrating what is known to be a cheat or deception."  *In re Moen,* 238 B.R. at 790 (quoting *RecoverEdge L.P. v. Pentecost,* 44 F.3d 1284, 1293 (5th Cir. 1995)).

The three causes of action are not mutually exclusive.  *See, e.g., Coleman v. Fields (In re Fields),* 544 B.R. 156, 174-76 (Bankr. E.D. Ark. 2016) (finding debtor's misuse of construction down payment was nondischargeable under both false pretenses and false representation exceptions); *In re Cole,* 164 B.R. at 950 (finding debtor-contractor incurred debt by both false

pretenses and false representation).  "[I]t is not always possible to neatly categorize the conduct

that amounts to fraud as being either 'actual fraud,' a 'false representation' or a 'false pretense.'"

*In re Moen*, 238 B.R. at 794.

The Bank argued that the misrepresented fact was that the Debtor lived on Haversham

Way in Memphis, Tennessee, when he, in fact, lived in Arkansas.  There is no dispute that the

Debtor never lived at the Haversham Way address.  While the testimony was clear that the

Debtor did not give the Bank the Haversham Way address, nor did he ever tell the Bank he lived

at the Haversham Way address, the Haversham Way address appeared on the following

documents: (1) the Buyer's Order; (2) the Utility Bill; (3) the Proof of Insurance; (4) the credit

application; (5) the Note; and (6) the Security Agreement.[6]  The Court finds the first element is

met as to the false address contained in the Buyer's Order and loan documents, but is not met as

to the false address contained in the Utility Bill and Proof of Insurance.

*Buyer's Order*.  The erroneous Haversham Way address was first communicated to the

Bank in the Buyer's Order it received from Southwind, a car dealership owned and operated by

the Debtor's relative, Mr. Marshall.  Although the Debtor did not send the Buyer's Order to the

Bank himself, the testimony revealed that the Debtor knew Mr. Marshall thought a Memphis

address should be used in order for the Debtor to qualify for a lower interest rate.  There is no

testimony or evidence suggesting that the Debtor believed he needed to use a Memphis address

to *obtain the loan itself*, just testimony that the use of the address may have resulted in a lower

interest rate.

---

[6] The Internal Loan Memo also listed the Haversham Way address as the Debtor's address, which Ms. Mathis pulled from the Buyer's Order.  Ms. Mathis testified that the memo was used in-house and contained information she pulled from the Buyer's Order, credit report, and Earnings Statement.  It was not signed by the Debtor, nor did it contain information not contained in another document.

The Debtor argued that it was Mr. Marshall and not himself that made the representation on the Buyer's Order that the Debtor resided at the Haversham Way address. Given the unusual circumstances of this case and the overriding questionable involvement of Mr. Marshall in the entire loan transaction, the Court finds merit in this argument; however, the fact that the Debtor acquiesced in the use of a Memphis address to obtain a lower interest rate cannot be ignored. Although the Debtor may not have seen the Buyer's Order prior to its submission to the Bank, the Court does believe the Debtor knew Mr. Marshall intended to use a Memphis address in their dealings with the Bank. That address then appeared in writing on the Buyer's Order. The Court believes this express representation was a false representation attributable to the Debtor sufficient to meet the first element under a cause of action for false representation. The Debtor's acquiescence in the use of a Memphis address also created a false impression sufficient to meet the first element under a cause of action for false pretenses. Therefore, the Court finds that the Bank met its burden of proving that the representation of the Haversham Way address in the Buyer's Order was a false representation attributable to the Debtor.[7]

_Utility Bill._ The Haversham Way address was also given to the Bank in the form of the Utility Bill bearing the same fax number as the number reflected on the Buyer's Order for Southwind. This Utility Bill was provided to the Bank as proof of the Debtor's address. The Debtor testified that he had not seen the Utility Bill until preparing for the trial with his attorney. No testimony or evidence to the contrary connects the Debtor with the Utility Bill or indicates that the Debtor knew the Utility Bill was even sent to the Bank as _proof of his address_ at the time of the loan transaction.

---

[7] Because the Bank met its burden of proving the first element, as to the Buyer's Order, under causes of action for false representation and false pretenses, the Court need not address whether the first element is also met under a cause of action for actual fraud.

As with the Buyer's Order, the Debtor argued that it was Mr. Marshall, not the Debtor, who provided the Utility Bill to the Bank so it was Mr. Marshall and not the Debtor making the representation. The Court finds this argument as to the Utility Bill more persuasive. The Utility Bill was a false representation in the form of a shut-off notice altered by changing the name on the Utility Bill to the Debtor's name and then presented to the Bank as *proof* of the Debtor's address on Haversham Way. The actions of altering the Utility Bill[8] and then faxing the Utility Bill to the Bank involve such calculated actions that the nature of the misrepresentation seems more deliberate and serious than listing the address on the Buyer's Order. The fax header on the Utility Bill matched the number associated with Southwind on the Buyer's Order.

Based on the Court's observations of the Debtor on the witness stand and his overall demeanor during the trial, the Court finds his testimony credible that he was not aware the false Utility Bill was being sent to the Bank as proof of address. Further, and more importantly to the Court, nothing in the testimony or evidence persuades the Court that the Debtor agreed or acquiesced in the overt actions of altering and sending the Bank this false Utility Bill. Even though he testified that he now sees, after the fact, that he should not have trusted his relative and used the Memphis address to see if he could get a lower interest rate, the Court came away from the trial with the firm conviction that the Debtor was raised by his parents to know right from wrong and was an honest person. To find that he knew about or acquiesced in changing the Utility Bill is not supported by the evidence. Therefore, the Court finds that the Bank did not meet its burden of proving that the address listed on the Utility Bill involved a false

---

[8]Although the Utility Bill reflected the Debtor's name as the customer, the Debtor testified that he never lived at the Haversham Way address. There was some testimony that the address may have been the address of a relative of Mr. Marshall. Although the occupant of the Haversham Way address is not clear from the evidence, it is clear to the Court that the Debtor should not have been reflected as the customer on the Utility Bill.

representation *of the Debtor* sufficient to meet the first element under causes of action for false pretense, false representation, or actual fraud.

*Proof of Insurance*.  The Haversham Way address was also on the Proof of Insurance the Bank received from Progressive Direct.  The fax number at the top of the Proof of Insurance is different from the number on the Buyer's Order and the fax number on the Utility Bill.  The Debtor testified that he had never had insurance with Progressive Direct and did not obtain the insurance with Progressive Direct reflected on the Proof of Insurance.  The Court finds the Debtor's testimony credible and is convinced that the Debtor had no knowledge or involvement in the procurement of the insurance coverage from Progressive Direct or the Proof of Insurance being sent to the Bank.  The testimony also reveals that Mr. Marshall had all the information available to procure the insurance on behalf of the Debtor.  The Court finds it out of the ordinary that the Debtor would have no input as to the company used for the insurance on a vehicle he was to purchase and believes the Debtor's testimony that he has never obtained insurance with Progressive Direct and normally buys insurance from USAA.  Therefore, the Court finds that the Bank did not meet its burden of proving that the Proof of Insurance involved a false representation *of the Debtor* sufficient to meet the first element under causes of action for false pretense, false representation, or actual fraud.

*Loan Documents*.  The Bank also argued that the Debtor represented his address as being the Haversham Way address by signing the credit application, Note, and Security Agreement (the "**Loan Documents**") at closing without disclosing the falsity of the address.  First, as discussed in detail below, the Court finds that the Debtor did not understand that he was at a loan closing and actually signing documents to purchase a vehicle when he signed the Loan Documents at the Bank.  At the time of the loan closing he had not yet found the newer 7 Series

32

BMW he wanted to purchase.  The testimony was clear that all the Loan Documents were prepared by the Bank and that the address used in the Loan Documents was taken from the Internal Loan Memo, using the address from the Buyer's Order.

Therefore, the Court must decide whether the Debtor's silence or his alleged concealment of a material fact in not disclosing the falsity of the address at the loan closing creates a false representation under the first element.  The Debtor testified that the information on the Loan Documents was filled in when he and Mr. Marshall arrived at the Bank for the loan closing and he did not notice the Haversham Way address being on the Loan Documents at closing.  Ms. Mathis testified that the address was not an item that she typically goes over with a customer at the loan closing.  Further, contrary to Ms. Mathis's testimony that based on her normal routine she believed she would have gone over the terms of the documents specifically with the Debtor, the Debtor recalled instead that the closing was a "real quick" process and Ms. Mathis was just telling him to "sign here, initial here."  (Tr. at 144).  The Debtor's recollection of the closing was more specific and certain than the testimony of Ms. Mathis, who did not recall the specifics of the loan closing, but was relying on her usual routine.  The Court finds the Debtor's testimony more credible.

However, the Court is reluctant to find that a borrower can sign documents without reading them and later disavow facts contained in what turned out to be the Loan Documents.  The Debtor was aware that Mr. Marshall intended to use a Memphis address for a loan with a lower interest rate.  The Court is persuaded that signing the documents without reviewing them and not revealing the falsity of the borrower's address was a representation attributable to the Debtor sufficient to meet the first element under a cause of action for false representation.  The Debtor's silence and acquiescence in the use of a Memphis address, even though he believed it

would only help him obtain a lower interest rate, also created a false impression sufficient to meet the first element under a cause of action for false pretenses. Therefore, the Court finds that the Bank has met its burden of proving the first element, that the Debtor made a false representation, by acquiescing in the use of the Memphis address and remaining silent when signing the Loan Documents.[9]

Based on the foregoing, the Bank has met its burden of proof as to the first element by proving that the Debtor made a false representation in connection with the Buyer's Order, which contained a false address, and by signing the Loan Documents and remaining silent about the falsity of his address.

### (2)  Were the false representations made with knowledge of their falsity?

The second element for the Court to consider, under all three causes of action, is whether the Debtor knowingly made the false representations. The Court finds the second element is met.

As stated above, the Debtor made false representations under the first element in allowing the Haversham Way address to be used by Mr. Marshall when he initiated the loan process with the Buyer's Order and by signing the Loan Documents at the closing and remaining silent about the address at the time of the loan closing. Although he may not have been actually aware of the use of the address on the Buyer's Order and may not have noticed the address on the Loan Documents at closing, at the time both of these representations were made, the Debtor was aware that he lived in Arkansas, not in Memphis, Tennessee. Therefore, the Bank has met its burden of proving the second element that the Debtor made the representations with knowledge that the representations were false at the time made.

---

[9] Because the Bank met its burden of proving the first element, as to the Loan Documents, under causes of action for false representation and false pretenses, the Court need not address whether the first element is also met under a cause of action for actual fraud.

### (3) Were the representations made deliberately to deceive the Bank?

The third element the Court must consider, under all three causes of action, is whether the Debtor made the representations deliberately for the purpose of deceiving the Bank. Even if the Debtor's acquiescence in the use of the Haversham Way address on the Buyer's Order and his silence regarding the use of the Haversham Way address on the Loan Documents at closing were false representations under the theories of false representation or false pretense, the Bank must still prove by a preponderance of the evidence that the Debtor had a subjective intent in making the misrepresentations to deceive the Bank. The Court finds that the Bank failed to meet its burden of proving intent.

"In order for the debt to be excepted from [the Debtor's] discharge pursuant to § 523(a)(2)(A), he must have knowingly made the representations or conveyed a false impression with the particular intent to deceive the [Bank]." *Minn. Client Sec. Bd. v. Wyant (In re Wyant)*, 236 B.R. 684, 698 (Bankr. D. Minn. 1999). "Because direct proof of intent (*i.e.*, the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred." *Van Horne*, 823 F.2d at 1287 (citing *In re Brown*, 55 B.R. 999, 1004 (Bankr. E.D.N.Y. 1986); *In re Frye*, 48 B.R. 422, 427 (Bankr. M.D. Ala. 1985); *In re Simpson*, 29 B.R. 202, 211 (Bankr. N.D. Iowa. 1983)). "When the creditor introduces circumstantial evidence proving the debtor's intent to deceive, the debtor 'cannot overcome [that] inference with an unsupported assertion of honest intent.'" *Id.* (quoting *In re Simpson*, 29 B.R. at 211-12). "The focus is, then, on whether the debtor's actions 'appear so inconsistent with his self-serving statement of intent that the proof leads the court to disbelieve the debtor.'" *Id.* at 1288 (quoting *In re Hunt,* 30 B.R. 425, 441 (M.D. Tenn. 1983)).

The first factor to be considered in determining intent is the Debtor's understanding of the loan closing. The process of buying a new car began when the Debtor went to Mr. Marshall to see if Mr. Marshall could assist the Debtor in buying a new Corvette. Due to the lengthy waiting period for the Corvette, the Debtor decided instead to purchase a newer 7 Series BMW. The Debtor testified that the vehicle on the Loan Documents, a 5 Series BMW, was not a vehicle he would have purchased. This testimony was both convincing and credible. The Debtor admits he gave his Earnings Statement, social security number, and a copy of his driver's license to Mr. Marshall to use in obtaining a BMW 750i.

There were no communications between the Bank and the Debtor except for the face-to-face meeting at the time of the loan closing. The Debtor testified that Mr. Marshall suggested they go to the Bank and visit with Mr. Marshall's friend to see if they could obtain a lower interest rate. Mr. Marshall then drove the Debtor to the Bank. At the time the Debtor was taken to the Bank by Mr. Marshall he had not found a car he wanted to purchase on Mr. Marshall's car lot and had his mind set to purchase a newer BMW 750i. When they arrived at the Bank, the Debtor testified that Ms. Mathis and Mr. Marshall appeared to know one another; they hugged, and started conversing about grandchildren and other personal matters. Based on the Debtor's testimony, which the Court finds credible, the Court is convinced the Debtor did not believe the meeting with Ms. Mathis at the Bank was a loan closing, or that he was obtaining a loan at the time he signed the Loan Documents. Instead, the Debtor believed Mr. Marshall was taking him to meet Mr. Marshall's friend to discuss the loan interest rate. The Debtor did not realize he had obtained a loan until the Bank started calling him for payments after the loan went into default.

This testimony is consistent with other evidence. The Debtor was twenty-seven years old at the time of the loan transaction. He had a high school education and one year of college.

36

Although he had a good job with the USPS, his testimony revealed him to be inexperienced in dealing with financial matters on his own and a person who had respect for and trusted authority figures in his life with important financial decisions.  The Debtor testified that he trusted his relative, Mr. Marshall, when he said he had a friend at the Bank they should go see and should use a Memphis address in order to obtain a better interest rate.  The Debtor's testimony in this regard was supported by his history of trusting his parents and having his parents accompany him when he purchased a motorcycle and when he closed on his home loan, a closing handled by his "mom's friend."

The Debtor had never purchased a vehicle prior to this transaction.  When asked by the Court what he thought he was buying at the time of the loan closing, the Debtor replied, "I didn't think I was buying.  [Mr. Marshall] was working on my interest rate, is what he was saying, and I – I see now that I shouldn't have trusted my uncle that much, at all."  (Tr. at 195).  This is consistent with his testimony that he did not believe at the time he signed the Loan Documents that he was actually entering into a loan transaction because his "uncle" had not yet found a BMW 750i for him to purchase.

He admitted that his parents raised him to be honest and understood at the time of trial that using the Haversham Way address to obtain a lower interest was not the right thing to do, adding that he understood, in hindsight, that he should not have trusted Mr. Marshall.  In addition, the Debtor gave Ms. Mathis and opposing counsel considerable respect in answering sometimes difficult and prying questions.  His demeanor during the entire trial was impressive to the Court. The testimony viewed as a whole demonstrated support for the finding that the Debtor has a respect for authority figures and would have believed he could trust Mr. Marshall, a relative and a person much more knowledgeable about car loans than himself.

37

Given the sequence of events as stated by the Debtor, the Court also finds the Debtor's testimony credible that he did not realize Mr. Marshall was taking him to the loan closing, but believed he was at the Bank to discuss an interest rate on a BMW 750i with Mr. Marshall's friend. When asked at trial if it was his intention to defraud the Bank, the Debtor replied, "No, ma'am. I promise." (Tr. at 155). The Court finds that the Debtor's demeanor, his testimony, and other evidence are not inconsistent with what the Bank may characterize as his self-serving statement that he did not intend to defraud the Bank.

Based on the foregoing discussion and given the circumstances of the loan transaction and the strange turn of events after the closing that Mr. Marshall received the loan proceeds from the Bank but never provided the Bank with the Collateral or the Debtor with a new vehicle, the Court finds that the Debtor's testimony is credible that he did not realize Mr. Marshall was taking him to the Bank for a loan closing. The Court is also mindful that it was the Bank and Mr. Marshall that had had an ongoing business relationship, while the Debtor was a stranger to the Bank. Therefore, from the Debtor's testimony and other relevant evidence presented, the Court finds that the Debtor may have been trusting and naïve, and himself deceived, but *he* had no subjective intent to defraud the Bank to obtain the loan.

Another factor to be considered in analyzing whether the Debtor intended to deceive the Bank is the Debtor's financial condition. "[C]onsidering the overall financial condition of the debtor may be one element among many circumstances" from which the Court could infer that the debtor incurred the debt fraudulently. *Wyant,* 236 B.R. at 699. This is not a circumstance where the Debtor has exhibited reckless disregard for the truth in obtaining credit. The Debtor's credit report and Earnings Statement clearly reflect his creditworthiness to be approved for a loan and his creditworthiness was never questioned by the Bank. In fact, Ms. Mathis testified more

38

than once that she was very impressed with the Debtor and his credit score.  The Debtor was ready, willing, and able to pay for a car loan and fully expected to start doing so once Mr. Marshall located the car of his choice.  It was obvious from Ms. Mathis's testimony that she believed the Debtor was well qualified for the purchase of a new vehicle.

Another factor the Court finds persuasive is the manner in which the loan closing was handled.  The focus here is on whether the Debtor's silence in signing the Loan Documents with the false address was with the intent to deceive.  As stated above, there were no communications between the Bank and the Debtor before the loan closing.  Ms. Mathis testified that she did not remember the specifics of the closing with the Debtor but did remember that he did not ask any questions.  She also admitted that although her normal routine would be to point out certain terms and provisions of the Loan Documents at closing, she did not recall any of the specifics of the Debtor's loan closing.  She did admit, however, that the address on the Loan Documents was not an item she would normally go over at a loan closing.

As found by the Court above, the Debtor did not believe he was going to a loan closing, but believed he was going to the Bank merely to discuss the loan and possible interest with the Bank.  The greeting between Ms. Mathis and Mr. Marshall, with hugs and the exchange of pleasantries about family, is consistent with the Debtor's belief that they were going to talk with Mr. Marshall's "friend."  Contrary to Ms. Mathis's testimony about her normal routine at loan closings, the Debtor recalls that the closing was a "real quick" process in which Ms. Mathis instructed him to "sign here, initial here" without reviewing the terms and provisions of the Loan Documents specifically.  (Tr. at 144).  No evidence was presented that the Debtor was asked to confirm the address on the Loan Documents, on the Utility Bill, on the Proof of Insurance, or on any other document at the closing.

Perhaps if the evidence had shown that the Debtor was aware of the false address on the Buyer's Order or Loan Documents, of if he were aware of the submission of the Utility Bill as proof of address, or of the Proof of Insurance, his silence during the time the Loan Documents were signed could be found to be an intention to deceive.  The Court believes the Debtor's testimony, however, that he did not notice the address on the Loan Documents at the time of closing, that he had never seen and had no knowledge of the false Utility Bill or Buyer's Order, and that he had no knowledge of the insurance from Progressive Insurance.

The Court finds from the overall testimony and demeanor of the witnesses that the Debtor's testimony is more credible in regard to the details of the loan closing.  Having himself only been involved in three closings in his lifetime (including this one), while Ms. Mathis had been involved in numerous closings over her more than twenty years in the banking business and admitted having very few independent memories of this closing, his recollection was more specific and credible.  The Court believes the Debtor's testimony that he did not notice the Haversham Way address on the Loan Documents and this is consistent with Ms. Mathis's testimony that she would not normally go over the address information.  Indeed, if the Debtor was not understanding that he was "buying" a vehicle that day, but just trusting his relative to talk to his "friend" about interest rates, it would be consistent with the Debtor's conduct not to ask a lot of questions or make statements at that time.

As stated above, the Debtor's overall appearance, demeanor in answering opposing counsel's questions in a respectful manner, and clear understanding, in retrospect, that Mr. Marshall was not someone he should have trusted, all lead the Court to believe the Debtor's testimony that he did not intend to defraud the Bank.  Although his silence can be found to be a

false representation under the first element, such silence in the facts before the Court do not support a finding of an intent to defraud.[10]

Finally, and notably, another factor unusual in the facts before the Court is that the Bank was not the only party that suffered a loss in this transaction. The Debtor certainly became liable for the loan by executing the Loan Documents, but gained no discernible benefit from the loan transaction. In fact, there was no credible evidence that any of the loan proceeds were used to pay off the Trade-in Vehicle or were actually used for the purchase of a new vehicle. The Debtor did not receive any of the loan proceeds personally, he never received the Collateral, nor did he ever receive a new vehicle from Southwind or Mr. Marshall. All he did receive was Mr. Marshall's promise that he was "working on" finding him a BMW 750i, a promise made both before and after the loan closing, and a promise that remained unfulfilled as of the date of the trial.

For the reasons stated, the Bank has not met its burden of proving the third element that the Debtor made false representations deliberately to deceive the Bank.

### (4) Did the Bank justifiably rely on the representations?

The fourth element the Court must consider, under all three causes of action, is whether the Bank justifiably relied on the false representations. Even if all the other elements were met, the Bank must still prove by a preponderance of the evidence that it justifiably relied on the false

---

[10] The Bank argued that after the loan was in default Ms. Mathis called the Debtor and left messages for him about payments due on the loan. The Debtor testified that when these calls started it was then that he first realized that he may have obtained a loan. During at least one post-closing conversation, the Debtor failed to disclose his belief that he did not have a loan with the Bank or that he had never obtained the Collateral. The Bank alleged that his silence during at least one conversation was evidence of intent to deceive. The Court disagrees. The Court believes the Debtor's testimony that after receiving a call from the Bank, he called Mr. Marshall to inquire, and Mr. Marshall assured the Debtor the issue would be handled. Then, when the calls continued, the Debtor did in fact tell Ms. Mathis he did not have the Collateral. The Court does not find intent to deceive based on the Debtor's delay in informing the Bank that he did not have the Collateral. This is especially true considering the trust the Debtor had in Mr. Marshall and his inexperience and lack of sophistication in important financial matters.

representations by the Debtor.  The Court finds that the Bank failed to meet its burden as to the fourth element.

"[J]ustifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and '[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.'" *Field,* 516 U.S. at 71-72 (quoting W. PROSSER, LAW OF TORTS § 108 (4th ed. 1971)).  "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular plaintiff, rather than of the application of a community standard of conduct to all cases." RESTATEMENT (SECOND) OF TORTS § 545A cmt. b (1976).  The standard for showing justifiable reliance under Section 523(a)(2)(A) is fairly low. *Guske v. Guske (In re Guske),* 243 B.R. 359, 363 (B.A.P. 8th Cir. 2000).

"Justifiability is not without some limits, however.   As a comment to § 541 explains, a person is 'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Field*, 516 U.S. at 71 (quoting, RESTATEMENT (SECOND) OF TORTS § 541 cmt. a (1976)).   Reliance on misrepresentations known by the creditor to be false or obviously false is not justified; falsity which could have been discovered by the senses during the cursory glance may not be relied upon.  RESTATEMENT (SECOND) OF TORTS §§ 540 cmt. a, 541 cmt. a (1976).  Therefore, a creditor cannot rely upon false representations if the falsity is obvious. "[I]f there are any warning signs . . . either in the documents, in the nature of the transaction, or in the debtor's conduct or statements, the creditor has not justifiably relied on [a] representation." *In re Guske,* 243 B.R. at 363-64.

In analyzing the facts of this case under the required standards it is appropriate to start with the qualities and characteristics of the particular plaintiff.  Here, the Bank representative in charge of the Debtor's loan transaction, Ms. Mathis, had twenty-five years of experience in the banking business at the time of trial, twenty of which were in the lending area, and she had made numerous automobile loans over her banking career.  In fact, in November 2012, Ms. Mathis had loan authority of up to $75,000.00 without the need for additional review or approval for her loan transactions.   The Court must determine, given Ms. Mathis's knowledge and experience, if during her cursory glance of the documents provided she should have discovered something that should have served as a warning that the Bank was being deceived.

Ms. Mathis testified that when the address on a borrower's credit report or driver's license is different from the buyer's order, she is required to obtain proof of address before approving the loan.  Here, the Buyer's Order reflected the Haversham Way address and both the credit report and driver's license reflected an Arkansas address.  The Bank, however, did not rely on the address in the Buyer's Order, which was then translated to the Loan Documents, for proof of the Debtor's address.  Ms. Mathis testified unequivocally that she relied on the Utility Bill as proof of the Debtor's address; that is <u>the</u> document upon which the Bank purportedly "relied."[11]

When the Bank received the Utility Bill on the day of closing as proof of the Debtor's address in Memphis, Tennessee, Ms. Mathis, as a knowledgeable and experienced lender should have sensed the warning signs that the Bank was being deceived.  The Utility Bill itself was dated November 9, 2012.  The Utility Bill contained a shut-off notice with a past-due balance,

---

[11] Ms. Mathis also testified about the Bank's primary lending area suggesting the Bank would not have made a loan to a customer outside of that area.  The Court does not find this testimony credible.  Although the evidence could be construed in two ways, the Court is more persuaded that the Bank would have made this loan outside the primary lending area.  In fact, the Bank's own exhibit proved that loans could be made outside of the primary lending area in some circumstances.  In addition, and Ms. Mathis's testimony regarding the Debtor's creditworthiness and her good impression of him appear to the Court the primary motivation for approving the loan.

and indicated that a previous shut-off notice was mailed to the Debtor on October 31, 2012. There was a reading date on the Utility Bill of October 10, 2012, indicating a bill for the previous month's service.

When asked whether it alarmed her that the Utility Bill contained a shut-off notice, Ms. Mathis testified that it was merely proof of the Debtor's residence. She then added that the Bank does not drive to the customer's address to see if he lives there and stated, *"I mean, we're talking about, you know, good credit score, good job, good – you know – like I said before – I thought highly of him."* (Tr. at 107) (emphasis added).

Based on Ms. Mathis' own testimony, the Court finds that the Bank likely relied on the Debtor's creditworthiness as evidenced by his credit score, employment history, and other such information in making the loan, not proof that he lived in Memphis, Tennessee. However, even if the Bank relied on the Debtor living in Memphis in making the loan, proof of which was provided by the Utility Bill, the Utility Bill did not contain a misrepresentation *from the Debtor* as explained above. Because the Debtor had no knowledge of the Utility Bill, much less knowledge of its contents, the Utility Bill cannot be said to be a misrepresentation *of the Debtor* on which the Bank justifiably relied.

Even if the Utility Bill contained misrepresentations attributable to the Debtor, the Utility Bill itself was full of warning signs that the Bank should have seen. First, it contained a shut-off notice. A shut-off notice in and of itself is a warning sign, but in this particular case it was also a red flag because the Debtor's credit report reflected a credit score of 694 and perfect payment histories on *all* reported debts. To be far enough behind in utility payments to warrant not one, but two, shut-off notices is inconsistent with the credit report. Second, the Utility Bill indicated that the Debtor had been living in Memphis for at least two months, but Ms. Mathis included the

Debtor's monthly mortgage payment on his Arkansas residence in the Debtor's expenses in approving the loan without any conversation with the Debtor regarding the ongoing nature of the mortgage payments. She also admitted she did not know if the Haversham Way address was a house or apartment, or whether the Debtor owned or rented the property. And her Internal Loan Memo included a monthly rent/mortgage payment of $625.00, without any explanation as to how Ms. Mathis derived at this figure. The monthly mortgage payment reflected on the Debtor's credit report was $695.00.

Accordingly, the Court finds that the Bank did not justifiably rely on a representation made by the Debtor. The Utility Bill, as the purported "proof" of the Debtor's residence may have contained a misrepresentation, but it was not a misrepresentation attributable to the Debtor. Moreover, under the circumstances of this case and given the experience and knowledge of Ms. Mathis, a cursory glance at the documents submitted for loan approval should have served as a warning to Ms. Mathis that something was wrong with the information on its face. Based on the record before the Court, the Court finds that the Bank has not met its burden of proving the fourth element that it justifiably relied a false representation made by the Debtor.

### (5) Did the misrepresentations proximately cause the Bank's damage?

The fifth factor the Court must consider, under all three causes of action, is whether the Debtor's false representations proximately caused the Bank's damage. In determining whether the false representation made by the Debtor proximately caused the Bank's injury, the Court follows the lead of the United States Supreme Court, which relied on the Restatement (Second) of Torts to define the concept of fraud as it was understood in 1978 when Section 523(a)(2)(A) was added to the Bankruptcy Code. *Field,* 516 U.S. at 70. The Restatement explains that proximate cause comprises two components: (1) causation in fact, and (2) legal causation.

Causation in fact is defined by the following rule: "The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss suffered by one who justifiably relies upon the truth of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss." RESTATEMENT (SECOND) OF TORTS § 546 (1976); *see also Smith v. Davenport (In re Davenport),* 491 B.R. 911, 919 (Bankr. W.D. Mo. 2013). Comment a to Section 546 adds that the rule is concerned with the question of "whether the misrepresentation made by the defendant has caused the plaintiff's loss at all." RESTATEMENT (SECOND) OF TORTS § 546 cmt. a (1976).

The Restatement also defines legal causation as related to misrepresentation. Section 548A provides, "A fraudulent misrepresentation is a legal cause of pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance." RESTATEMENT (SECOND) OF TORTS § 548A (1976); *see also In re Davenport*, 491 B.R. at 919. Legal causation requires that the loss be reasonably expected to occur from the reliance and is a question of foreseeability. *Sharfarz v. Goguen (In re Goguen),* 691 F.3d 62, 70 (1st Cir. 2012) (quoting *Sys. Mgmt. v. Loiselle*, 303 F.3d 100, 104 (1st Cir. 2002)).

Neither type of causation is applicable to this case because the Court has found that the Debtor lacked intent to defraud and, therefore, his misrepresentations were not fraudulent. The Court has also determined that the Bank did not justifiably rely on any misrepresentations made by the Debtor. Both elements must be satisfied before the Court can apply the Restatement rules on causation, which specifically presume a *fraudulent* representation and justifiable *reliance.* Accordingly, the Bank failed to meet its burden of proof as to the fifth and final element that the Debtor's misrepresentations proximately caused the Bank's loss.

46

**CONCLUSION**

For the reasons stated herein, the Bank failed to meet its burden to prove that its debt

should be declared nondischargeable under Section 523(a)(2)(A).  The Court acknowledges the

series of events involved in this loan transaction were bizarre, and may have involved fraudulent

conduct.  The Court is of the firm conviction, however, that it was not the fraudulent conduct *of

the Debtor* at issue here.  The debt owed by the Debtor to the Bank is accordingly determined to

be dischargeable.  Judgment will be entered in favor of the Defendant, Mr. Hampton.

**IT IS SO ORDERED.**

Phyllis M. Jones
United States Bankruptcy Judge
Dated:  04/20/2016

cc:     Mr. Steven N. Douglass
        Mr. Pablo A. Varela
        Ms. Danyelle J. Walker
        Debtor